IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

KANA FARRELL, ORIANA LEE FARRELL,
as an individual and O.B.O. her minor children
HEZEKIAH FARRELL, II, KUSH FARRELL,
MAGNIFICENT FARRELL,
and GILBRALTAR FARRELL,

      Plaintiffs,

v.                                      No. 15-cv-1113 SMV/LAM

TONY DETAVIS, ANTHONY LUNA,
ELIAS MONTOYA, NEW MEXICO STATE
POLICE DEPARTMENT, and JOHN DOES 1–3,

      Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS DETAVIS, LUNA, AND NMSPD'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT MONTOYA'S MOTION FOR SUMMARY JUDGMENT/MOTION FOR JUDGMENT ON THE PLEADINGS**

THIS MATTER is before the Court on Defendant Officers Detavis, Luna, and New Mexico State Police Department's ("NMSPD") Motion for Summary Judgment [Doc. 29], filed on March 25, 2016, and on Defendant Officer Montoya's Motion for Summary Judgment/Motion for Judgment on the Pleadings [Doc. 40], filed on May 9, 2016.  The Court held oral argument on August 16, 2016.  [Doc. 64].  Having considered the pleadings, briefs, oral argument, and relevant law, and being otherwise fully advised in the premises, the Court finds that Officers Detavis, Luna, and NMSPD's Motion is well-taken and will be granted, and that Officer Montoya's Motion is well-taken in part and will be granted in part and denied in part.

## BACKGROUND

This lawsuit arises from events that took place during and after a traffic stop in the early afternoon of October 28, 2013, on a stretch of New Mexico Highway 518 between Peñasco and Talpa.  [Doc. 1-1] at 2.  The events that are the subject of Plaintiffs' claims were captured on video by Officer Detavis' "dash cam."  *Id.*; *see* [Doc. 31] (dash cam video).  The video depicts a chaotic and confused scene.  Officer Detavis initially pulled over Plaintiffs; Officers Luna and Montoya arrived later.

As the dash cam video begins, Plaintiffs' van is stopped on the right-hand shoulder of Highway 518, a two-lane highway.  [Doc. 31] at 0:00.  Oriana Farrell and her five children (Kana (age 16), Hezekiah (age 14), Kush (age 12), Magnificent (age 9), and Gibraltar (age 6)) are inside.  [Doc. 53-4] at 1; [Doc 1-1] at 3–4.  Officer Detavis' patrol vehicle is parked behind Plaintiffs' van with its lights activated.  [Doc. 31] at 0:00–4:52.  He exits his vehicle, walks to the front passenger door, and returns Ms. Farrell's driver's license to her.  *Id.* at 4:55–59.  He informs her that she is receiving a citation for going 71 mph in a 55-mph zone and that she has two options: pay a fine of $126 or go to Taos magistrate court.  *Id.* at 5:00–5:17.

Ms. Farrell repeatedly refuses to choose an option.  *Id.* at 5:17–6:15.  Officer Detavis informs her that she may also choose to see a judge immediately if she does not want to sign the citation.  *Id.* at 6:18.   She continues to refuse to make a decision.  *Id.* at 6:20–6:40.  Officer Detavis tells her that he is "cutting her a break" by not citing her for driving with an expired driver's license.  *Id.* at 6:41–6:50.  Ms. Farrell did not believe that her license was expired. [Doc. 54-3] at 2; *see also id.* at 6 (photocopy of Oriana Farrell's Tennessee driver's license valid from April 12, 2010, to April 28, 2014).

2

Without raising his voice, Officer Detavis continues to order Ms. Farrell to choose one of the options. *Id*. at 6:50–8:15. Eventually, he tells her that he is going back to his patrol vehicle to inform dispatch that she will not choose an option. *Id*. at 8:15. He tells her that he will "be right back" and orders her to turn off the van. *Id*. at 8:42–9:10. Instead of complying, she drives away. *Id*. at 9:10. Officer Detavis follows the van with his sirens and lights on until Ms. Farrell pulls over again. *Id*. at 9:27–10:00. According to the dash cam's speed indicator, both vehicles were travelling at or near the speed limit of 55 mph during this period. After Ms. Farrell pulls over, Officer Detavis informs dispatch that he is going to "get her out of the vehicle." *Id*. at 10:09.

Officer Detavis exits his vehicle, walks to the driver's front door, and pulls it open. *Id*. at 10:28. Because of the dash cam's position, it is impossible to see Officer Detavis fully in the video. However, it is clear that he is standing right next to Ms. Farrell, who remains seated in the driver's seat. He shouts at her to "get out of the vehicle." *Id*. The children in the van shout at Officer Detavis to "get off of her" and "leave her alone." *Id*. at 10:35–45. Officer Detavis repeatedly orders Ms. Farrell to come talk to him behind the van, but she refuses to comply. *Id*. at 11:00.

Plaintiff Hezekiah Farrell, who was fourteen years old and around the same height as Officer Detavis at the time, exits the van through the rear passenger sliding door. [Doc. 1-1] at 3; [Doc. 31] at 11:05. He walks around the front of the van toward Officer Detavis, who pulls out his Taser, points it at Hezekiah, and orders him to get back in the van. Hezekiah complies. [Doc. 1-1] at 3; *id*. at 11:10–15. Officer Detavis continues to order Ms. Farrell to get out of the van; she continues to refuse. He then tries to pull her out. She resists. *Id*. at 11:20–12:00.

Officer Detavis informs her that she is "already facing evading charges." In response, she insists that she "did not run away." *Id*. at 12:49–55. Officer Detavis tells her, "I'm going to ask you one more time to get out of the vehicle and then I'm going to pull you out, okay?" *Id*. at 12:55. Ms. Farrell asks him for assurances that he will not "grab" her and that he will be "peaceful." *Id*. at 13:00−15:45. She also offers to sign the speeding citation, but Officer Detavis tells her that she is "past that point now." *Id*. at 14:35.

After refusing to comply with Officer Detavis' orders to get out of the van for over five minutes, Ms. Farrell gets out of the van and walks behind it. *Id*. at 16:00. Ms. Farrell insists that she "was not trying to take off" from the initial traffic stop. *Id*. at 16:15. Officer Detavis then asks her to turn around (presumably so that he could handcuff her), and she quickly moves around him to get back to the driver's front door. *Id*. at 16:30. Officer Detavis attempts to stop her by grabbing her arms. The children in the van immediately start screaming. Hezekiah and two other children exit the van and move towards Officer Detavis. As the children approach him, and while he is still holding on to her arms, Ms. Farrell collides with the door of the van. *Id*. at 16:35. Hezekiah approaches Officer Detavis and scuffles with him for a few seconds before Officer Detavis backs away, pulls out his Taser again, and orders Hezekiah repeatedly to "get on the ground." *Id*. at 16:45; [Doc. 1-1] at 3. Hezekiah does not comply, but instead runs around the front of the van and re-enters it on the passenger side. All Plaintiffs get back into the van just as Officers Luna and Montoya arrive in their patrol vehicles. *Id*. at 17:03. Officer Detavis orders Hezekiah to "get out! Get out now!" *Id*. at 17:05. He attempts to open the passenger-side doors, but both are apparently locked.

Officer Luna runs to Officer Detavis' side and they shout at Plaintiffs to "open the door . . . open the fucking door!"  *Id*. at 17:15.  Officer Luna asks if "he" (presumably Hezekiah) has a gun, and Officer Detavis replies, "No."  *Id*. Officer Detavis pulls out his baton, raises it to shoulder level, and breaks the window, hitting it four times as the children inside scream.  The window glass shatters.  *Id*. at 17:15.  Although no one is struck by the baton, glass shards fall onto Hezekiah and the other children in the back seat.  [Doc. 54-4] at 3; [Doc. 54-5] at 2.

Officer Montoya unholsters his firearm almost immediately after he arrives and runs to the rear driver's side of the van.  *Id*. at 17:14.  Ms. Farrell then begins to pull away.  As the van moves forward, away from all three officers and back onto the highway, Officer Montoya fires three shots at the van.  *Id*. at 17:20–26.  Officer Luna starts to chase the van on foot, then stops and unholsters his weapon as the van moves farther away.  He does not fire.  *Id*. at 17:25.

All three officers return to their vehicles and pursue Plaintiffs down Highway 518.  *Id*. at 17:30.  According to the dash cam, the chase reaches speeds of close to 100 mph.  *Id*. at 18:15.  Once she arrives in a more populated area, Ms. Farrell drives erratically through traffic, at one point crossing the double yellow line into the oncoming lane to turn right through an intersection.  *Id*. at 20:03.  During the chase, Officer Detavis tells dispatch that Plaintiffs did not appear to have a gun.  [Doc. 30] at ¶ 28.

After more than four minutes of engaging the officers in a dangerous high-speed chase, Ms. Farrell pulls into a hotel parking lot.  *Id*. at 21:54.  Plaintiffs exit the vehicle with their hands up and lay on the ground.  *Id*. at 22:10.  Ms. Farrell and Hezekiah are handcuffed and led away.  *Id*. at 22:15–23:00.  The other four children are escorted away separately.  *Id*. at 23:25.

Ms. Farrell was subsequently charged with Abuse of a Child (no death or great bodily harm)[1] (a third third-degree felony), Aggravated Fleeing a Law Enforcement Officer (a fourth degree felony),[2] and Use or Possession of Drug Paraphernalia (a misdemeanor).[3] [Doc. 1-1] at 5. She pleaded guilty to the first two charges; the third was dismissed. *Id*. at 6. Hezekiah was

---

[1] NMSA 1978 § 30-6-1(D)(1) provides that "[a]buse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be: (1) placed in a situation that may endanger the child's life or health," while § 30-6-1(E) provides that

> A person who commits abuse of a child that does not result in the child's death or great bodily harm is, for a first offense, guilty of a third degree felony and for second and subsequent offenses is guilty of a second degree felony. If the abuse results in great bodily harm to the child, the person is guilty of a first degree felony.

[2] NMSA 1978 § 30-22-1.1(A) provides that

> Aggravated fleeing a law enforcement officer consists of a person willfully and carelessly driving his vehicle in a manner that endangers the life of another person after being given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed law enforcement officer in an appropriately marked law enforcement vehicle in pursuit in accordance with the provisions of the Law Enforcement Safe Pursuit Act.

[3] NMSA 1978 § 30-31-25.1(A) provides that

> It is unlawful for a person to use or possess with intent to use drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale or otherwise introduce into the human body a controlled substance in violation of the Controlled Substances Act. The provisions of this subsection do not apply to a person who is in possession of hypodermic syringes or needles at the time he is directly and immediately engaged in a harm reduction program, as provided in the Harm Reduction Act.

charged with Battery Upon a Police Officer, a fourth-degree felony.[4]  *Id*. at 5.  The charge was later dismissed.  *Id*. at 6.

## PROCEDURAL HISTORY

Plaintiffs filed their Complaint in state court on October 27, 2015.  [Doc. 1-1].  It was divided into five counts, which were labeled as follows: (1) Section 1983 claim for excessive force in violation of the Fourth and Fourteenth Amendments; (2) Section 1983 claim for failure to protect in violation of the Fourth and Fourteenth Amendments; (3) Failure to train/negligent supervision; (4) state law tort claims; and (5) "State Tort Claims for Damages Proximately Caused by the Violation of Federal and State Constitutional Rights."  *Id*. at 7–15.  NMSPD removed the case to this Court on December 9, 2015.  [Doc. 1].  All parties consented to the undersigned's entering judgment in this matter.  [Doc. 14].

Officers Detavis, Luna, and NMSPD answered on December 16, 2015.  [Doc. 9].  Officer Montoya answered on February 12, 2016.  [Doc. 23].  Plaintiffs voluntarily dismissed all claims against the individual defendants in their official capacities.  [Docs. 19, 20].

Officers Detavis, Luna, and NMSPD filed their motion for summary judgment on March 25, 2016.  [Doc. 29].  Their motion concerns only the § 1983 claims; the state-law claims are not briefed.  *See id*.  Plaintiffs responded on July 25, 2016.  [Doc. 54].  Officers Detavis, Luna, and NMSPD replied on August 8, 2016.  [Doc. 57].

---

[4] NMSA 1978 § 30-22-24(A) provides that

> Battery upon a peace officer is the unlawful, intentional touching or application of force to the person of a peace officer while he is in the lawful discharge of his duties, when done in a rude, insolent or angry manner.

Officer Montoya filed a motion for summary judgment on the § 1983 claims and for judgment on the pleadings on the state-law claims on May 9, 2016.  [Doc. 40].  Plaintiffs responded on July 25, 2016.  [Doc. 53].  Officer Montoya replied on August 10, 2016. [Doc. 63].

The Court held a hearing on both motions on August 16, 2016.  [Doc. 64].  On August 19, 2016, the Court ordered supplemental briefing on whether NMSPD is immune from suit under § 1983 as an "arm of the state."  [Doc. 65].  Plaintiffs and NMSPD filed their briefs on August 26, 2016.  [Docs. 67, 68].

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quotation marks omitted).  Once the movant meets this burden, Rule 56 requires the non-movant to designate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the non-movant.  *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

However, when an individual defendant moves for summary judgment on the basis of qualified immunity, the analysis is somewhat different. *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 940 n.6 (10th Cir. 2008) ("[W]e acknowledge our long-standing view

8

that the task of district courts, and consequently appellate courts, is different in reviewing motions for summary judgment under traditional standards and qualified immunity principles. Indeed, courts should exercise care not to confuse the two analytical frameworks.") (citations omitted).  Applying the proper analytical framework can be challenging. *See Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1324 (10th Cir. 2009) ("Courts and litigants alike often have difficulty analyzing whether summary judgment on the basis of qualified immunity is appropriate.") (Holmes, J., concurring.).

"The doctrine of qualified immunity protects public or government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Once a defendant asserts qualified immunity, the plaintiff bears the heavy burden of satisfying a "strict two-part test." *McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010) (citation omitted).  The plaintiff must establish that (1) the defendant violated a constitutional or statutory right, and (2) the right was clearly established at the time of the defendant's conduct. *Rojas v. Anderson*, 727 F.3d 1000, 1003 (10th Cir. 2013).  "If the plaintiff fails to satisfy either part of this two-part inquiry, the court must grant the defendant qualified immunity." *Hesse v. Town of Jackson*, 541 F.3d 1240, 1244 (10th Cir. 2008) (quotation marks omitted).  But, if the plaintiff succeeds in carrying her two-part burden, the burden shifts to the defendant who must show there are no remaining material issues of fact that would defeat the claim of qualified immunity. *Estate of Booker v. Gomez*, 745 F.3d 405, 412 (10th Cir. 2014).

Assuming the plaintiff establishes that the defendant violated a constitutional right, the Court must then determine—as a matter of law—whether the defendant's conduct violated clearly established law.  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citations and quotation marks omitted).  Ordinarily, for a rule to be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011).  "However, because excessive force jurisprudence requires an all-things-considered inquiry with careful attention to the facts and circumstances of each particular case, there will almost never be a previously published opinion involving exactly the same circumstances.  [The Court] cannot find qualified immunity wherever [there is] a new fact pattern."  *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (citations and quotation marks omitted).  As a result, the Tenth Circuit has adopted a sliding scale to determine when law is clearly established.  "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."  *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled in part by Pearson*, 555 U.S. 223.

In deciding a motion for summary judgment based on qualified immunity, the Court construes the facts in the light most favorable to the plaintiff. *Thomson*, 584 F.3d at 1312. However, at the summary judgment phase of the litigation, a plaintiff's version of the facts must find support in the record. *Id.* "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]" *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## ANALYSIS

Plaintiffs bring claims under the United States Constitution, New Mexico law, and the New Mexico Constitution. The Court will address the federal claims first, followed by the state claims.

### I.   Excessive Force Claims (Count I)

#### A.  The particular facts of a case determine the constitutional provision under which a claim for excessive force may be brought.

Depending on the circumstances, an excessive force claim may be asserted under the Fourth, Fifth, Eighth, or Fourteenth Amendment, thereby requiring application of different legal standards. In deciding how to characterize an excessive force claim, the Tenth Circuit Court of Appeals explained:

> Any force used "leading up to and including an arrest" may be actionable under the Fourth Amendment's prohibition against unreasonable seizures. By contrast, claims of excessive force involving convicted prisoners arise under the Eighth Amendment. And when neither the Fourth nor Eighth Amendment applies— when the plaintiff finds himself in the criminal justice system somewhere between the two stools of an initial seizure and post-conviction punishment—we turn to the due process clauses of

11

> the Fifth or Fourteenth Amendment and their protection against
> arbitrary governmental action by federal or state authorities.

*Booker*, 745 F.3d at 419 (citations omitted).

In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court held that

> *[A]ll* claims that law enforcement officers have used excessive
> force . . . in the course of an arrest, investigatory stop, or other
> "seizure" of a free citizen should be analyzed under the Fourth
> Amendment and its "reasonableness" standard, rather than under a
> "substantive due process" approach.    Because the Fourth
> Amendment provides an explicit textual source of constitutional
> protection against this sort of physically intrusive governmental
> conduct, that Amendment, not the more generalized notion of
> "substantive due process," must be the guide for analyzing these
> claims.

*Id*. at 395.  The analysis shifts to the Due Process Clause at some point after an arrest.  *Pierce*,

359 F.3d at 1285–86.

1.   <u>In order to bring a claim under the Fourth Amendment,</u>
<u>a plaintiff must have been seized at the time of the alleged excessive force.</u>

"[W]ithout a seizure, there can be no claim for excessive use of force in effectuating that

seizure."  *Jones v. Norton*, 809 F.3d 564, 575 (10th Cir. 2015), *petition for cert. filed*, (U.S.

July 13, 2016) (No. 16-72).  A seizure occurs when an officer has, "by means of physical force

or show of authority, . . . in some way restrained the liberty of a citizen."  *Terry v. Ohio*, 392

U.S. 1, 19 n.16 (1968)).  The test for whether there has been a show of authority is whether a

reasonable person would believe that, through his words and actions, an officer was ordering the

individual to stop.  *California v. Hodari D.*, 499 U.S. 621, 628 (1991)  However, a seizure does

not occur if an individual does not yield to the officer's show of authority.  *Id.* at 626.  The

Supreme Court explained it this way:

> The word "seizure" readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful. ("She seized the purse-snatcher, but he broke out of her grasp.") It does not remotely apply, however, to the prospect of a policeman yelling "Stop, in the name of the law!" at a fleeing form that continues to flee. That is no seizure.

*Id.* The Court has also stated that "[a] traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment." *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014) (citation omitted).

2. Plaintiffs were seized at the time of the alleged excessive force.

Each officer argues that he is entitled to qualified immunity on Plaintiffs' Fourth Amendment excessive force claims because Plaintiffs were never seized. [Doc. 29] at 21 ("[N]o seizure occurred prior to the voluntary stop by Plaintiffs in the hotel parking lot."); [Doc. 40] at 11 (Because "[Officer Montoya's] actions do not constitute a Fourth Amendment seizure. . . . the plaintiffs' claim of excessive force cannot be considered."). After a thorough review of the law in this area, the Court concludes that the Fourth Amendment governs the entire encounter captured on the video.

In support of their position that they are entitled to qualified immunity on Plaintiffs' Fourth Amendment claims, the officers cite a number of cases where a court found that a plaintiff could not succeed on a claim brought under the Fourth Amendment because no seizure occurred. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998) (plaintiff, a passenger on motorcycle whose driver ignored police commands and engaged in a high-speed chase ending in plaintiff's death when police vehicle struck motorcycle, was not seized); *Jones*, 809 F.3d 564 (no seizure occurred when officers chased plaintiff in car and then on foot and the encounter

ended with plaintiff shooting himself); *Bella v. Chamberlain*, 24 F.3d 1251 (10th Cir. 1994) (plaintiff, a helicopter pilot who was kidnapped and forced by his captors to land in a prison yard at gunpoint, was not seized when law enforcement officers shot at the helicopter but plaintiff did not stop); *Hodari D.*, 499 U.S. 621 (suspect who dropped drugs while he was running from officer was not seized until the officer caught up with him and tackled him, meaning that the drugs were not the fruit of a seizure); *Cole v. Bone*, 993 F.2d 1328 (8th Cir. 1993) (plaintiff who drove through toll booth without stopping and was pursued by officers at high speed was not seized until he was shot in the forehead).

These cases share one crucial similarity: at no point did the suspect submit to a show of authority by law enforcement. *See, e.g.*, *Cole*, 993 F.2d at 1332 (holding that plaintiff was not seized until he was hit by officer's bullet and noting that "[t]he pursuit [of plaintiff] in and of itself did not constitute a seizure, because it did not produce a stop."). In contrast, it is undeniable that Ms. Farrell submitted to Officer Detavis' show of authority. She stopped her van on the side of the road because Officer Detavis pursued her with his sirens and lights activated. Despite initially refusing to comply with his order to do so, she exited the van and walked behind it. Defendants do not explain how these actions do not constitute a submission to lawful authority, especially considering that "there is no minimum time that a plaintiff's freedom of movement must be terminated in order to establish that a seizure has occurred." *Kyle v. Bedlion*, 2016 WL 1301043, at *6 (D.D.C. Apr. 1, 2016) (unpublished), *appeal filed*, No. 16-7040 (D.C. Cir. Apr. 11, 2016).

In *United States v. Mendenhall*, 446 U.S. 544, 554 (1980), the Supreme Court said, "[w]e conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in

view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." At the end of the first stop, Officer Detavis clearly ordered Ms. Farrell to "turn off [the] vehicle." No reasonable person would have believed she was free to leave after receiving such an order from a police officer. Nor would any reasonable person have believed she was free to leave the scene after the second stop. First, when Officer Detavis ordered Ms. Farrell to "turn around," it was clear that he intended to handcuff her. Later, he grabbed her arms to attempt to keep her from reentering the van. There is no doubt that she was "seized" within the meaning of the Fourth Amendment at that point.

The Court's thorough survey of relevant case law has revealed that in factual circumstances like these, where the suspect flees an initial seizure, the Fourth Amendment applies to the entire encounter. The facts of this case are analogous to those in *United States v. Brodie*, 742 F.3d 1058 (D.C. Cir. 2014). In *Brodie*, the court found that the defendant was seized when, in response to an order from police, he placed his hands on the police car but then ran away. The court stated that "the short duration of [defendant's] submission means only that the seizure was brief, not that no seizure occurred. Later acts of noncompliance do not negate a defendant's initial submission, so long as it was authentic." *Id.* at 1061.

Here, Plaintiffs' "later acts of noncompliance" (that is, driving away from the officers) do not mean that they were never seized at all. *See also United States v. Dupree*, 617 F.3d 724, 742 (3d Cir. 2010) (rejecting government's argument that Fourth Amendment no longer applied after a defendant broke free from an initial seizure); *United States v. Coggins*, 986 F.2d 651, 654 (3d Cir. 1993) (rejecting government's argument that defendant's flight from agent removed the

case from Fourth Amendment's purview); *but cf. United States v. Epps*, 983 F.2d 1058 (4th Cir. 1992) (finding that suspect was no longer seized while in flight from initial seizure).

Officers Detavis and Luna's argument that "no seizure occurred prior to the voluntary stop by Plaintiffs in the hotel parking lot" is unpersuasive. [Doc. 29] at 21. "Even a momentary stop is a Fourth Amendment seizure." *United States v. Beamon*, 576 F. App'x 753, 758 (10th Cir. 2014) (citations omitted). Officer Montoya's argument that he is entitled to qualified immunity because Plaintiffs did not submit to *his* show of authority—an argument for which he provides no legal authority—is even less persuasive. [Doc. 40] at 11–12. None of the officers has provided authority showing that the Fourth Amendment ceases to apply if a suspect briefly flees after being detained.[5]

Plaintiffs allege that Officers Detavis, Luna, and Montoya used excessive force in violation of the Fourth and Fourteenth Amendments. [Doc. 1-1] at 9. Plaintiffs' allegations relate to force used "leading up to and including an arrest," *Booker*, 745 F.3d at 419; thus, the Fourth Amendment applies to the officers' uses of force. Therefore, the Court will dismiss Plaintiffs' Fourteenth Amendment excessive force claims with prejudice and analyze those claims under the Fourth Amendment.[6]

---

[5]At the hearing, Officer Montoya's counsel referenced an unpublished case from the District of New Mexico in which the Court held that, in the context of a motion to suppress, "Defendant was no longer 'seized' within the meaning of the Fourth Amendment when he escaped the scene of the traffic stop by fleeing on foot." *United States v. Carrell*, 05-cr-1484 MCA-1, (D.N.M. June 30, 2006), ECF No. 102, at *22. After careful review of *Carrell* and the other authorities discussed herein, Officer Montoya has not convinced the Court that the Fourth Amendment had ceased to apply when he fired those three shots.

[6]At the hearing, Plaintiffs' counsel repeatedly referred to claims under the Fifth Amendment. Plaintiffs' Complaint contains no reference to the Fifth Amendment. *See* [Doc. 1-1]. Plaintiffs' responses to the instant motions, [Docs. 53, 54], state "Alternatively, If The Court Finds Plaintiffs Were Not Seized, Defendants Violated Plaintiffs' Substantive Due Process, Under the Fifth and Fourteenth Amendments, Via Excessive Force." [Doc. 53] at 20 n.1, [Doc. 54] at 21. To the extent Plaintiffs intended to bring a claim under the Fifth Amendment, they have failed. First, Plaintiffs did not allege a violation of the Fifth Amendment in their Complaint. Second, Plaintiffs' excessive

**B.  Standard for Excessive Force Claims under the Fourth Amendment**

The consideration of every Fourth Amendment excessive force claim starts with the recognition that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat." *Graham,* 490 U.S. at 396. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (citations and quotation marks omitted).  This includes consideration of three factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.*  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*  The Tenth Circuit has instructed that courts may not engage in "unrealistic second guessing of police officers' decisions." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994) (citation and quotation marks omitted).  Finally, the officer's state of mind is irrelevant to a determination of whether excessive force was used.  "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham,* 490 U.S. at 397.

---

force claims are brought against state actors, as opposed to federal actors, and would be properly brought under the Fourteenth Amendment. *See Bowles v. Willingham*, 321 U.S. 503, 518 (1944) (noting that "the restraints imposed on the national government . . . by the Fifth Amendment are no greater than those imposed on the States by the Fourteenth.").

### 1. Officer Detavis

#### a.   Officer Detavis' attempts to pull Ms.  Farrell from the van did not violate her constitutional rights.

Officer Detavis unquestionably used force when he grabbed Ms. Farrell and tried to pull her out of the van.  In his affidavit submitted with his motion for summary judgment, he acknowledges that he pulled Ms. Farrell's arm.  [Doc. 30] at 3.  In his Statement of Probable Cause, written on the day of the incident, he stated that he first grabbed her wrist, and later her wrist and the back of the head.  [Doc. 40-2] at 5.  Ms. Farrell alleges that Officer Detavis grabbed her arms and shoulders, and later her hair, head, and neck while she was seated in the van.  [Doc. 54-3] at 3.  Because of the position of the dash cam, is not entirely clear from the video where he initially grabbed Ms. Farrell.  Later, it is clear that he pulled her arms as she was trying to get away from him and get back into the van.

The video clearly refutes Plaintiffs' allegation that Officer Detavis was "extremely aggressive" in his efforts to remove Ms. Farrell from the van.  [Doc. 54-3] at 3.  "[W]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." *York,* 523 F.3d at 1210.  Officer Detavis tugged on Ms. Farrell, but did not violently wrench or jerk her.  Plaintiffs' characterization of his actions as "deadly force," [Doc. 54] at 10, is contradicted by the dash cam video.  Still, Ms. Farrell argues that this use of force was unreasonable.  *Id*. Considering all facts in the light most favorable to Plaintiffs, the Court disagrees.

The first factor—the severity of the crime—weighs against Ms. Farrell.  Ms. Farrell was eventually charged with Abuse of a Child (no death or great bodily harm) (a third third-degree felony), Aggravated Fleeing a Law Enforcement Officer (a fourth degree felony), and Use or

Possession of Drug Paraphernalia (a misdemeanor).  [Doc. 1-1] at 5.  However, according to Officer Detavis, at the time that he tried to pull her out of the van, she was "facing evading charges."  [Doc. 31] at 12:50; *see also* Reply [Doc. 57] at 11 ("Oriana Farrell chose to take off and thus sought to evade arrest.").  Evading an officer under NMSA 1978 § 30-22-1(B)[8] is a misdemeanor and a less severe crime than the charges eventually brought against Ms. Farrell.  However, Officer Detavis' use of force at this time was relatively minor.

The second factor—whether the suspect posed an immediate threat to the safety of the officers or others—weighs slightly for Ms. Farrell.  There is no indication that Ms. Farrell herself was a danger to Officer Detavis, passers-by, or her children after she stopped on the side of the road the second time.  While not compliant, she was neither belligerent nor aggressive.  She referred to Officer Detavis as "sir" and told him she was trying to keep her children calm.  If anything, she sounds frightened, not combative.  However, there was some danger to Officer Detavis.  Plaintiffs were parked on the side of a highway with numerous cars passing and Officer Detavis was standing in the lane of traffic.

The third factor—whether the suspect is actively resisting arrest or attempting to evade arrest by flight—weighs against Ms. Farrell.  Ms. Farrell had fled from a traffic stop, refused to comply with Officer Detavis' orders, and then tried to get away from him when he attempted to handcuff her.

The Court views the evidence in the light most favorable to Ms. Farrell, keeping in mind that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's

---

[8] NMSA 1978 § 30-22-1(B) provides that "intentionally fleeing, attempting to evade or evading an officer of this state when the person committing the act of fleeing, attempting to evade or evasion has knowledge that the officer is attempting to apprehend or arrest him."

chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 397 (citation omitted).  The dash cam video establishes that the force used by Officer Detavis when attempting to pull Ms. Farrell out of the van and, later to keep her from getting back into the van, was not objectively unreasonable.  *See Mecham v. Frazier*, 500 F.3d 1200 (10th Cir. 2007) (officers did not use excessive force in effecting arrest of plaintiff who refused to exit her vehicle after receiving a traffic citation when they pepper-sprayed her face and pulled her from the car); *see also Lawrence v. Kenosha Cty.*, 391 F.3d 837 (7th Cir. 2004) (officer did not use excessive force when he attempted to pull plaintiff out of the vehicle by plaintiff's left arm because plaintiff was combative, refused to produce a driver's license, and was in a moving vehicle).  After considering the facts in the light most favorable to Plaintiffs, but in view of the video evidence of the encounter, the Court finds that Officer Detavis is entitled to qualified immunity for trying to pull Ms. Farrell out of the van and trying to keep her from reentering it because his actions did not violate the Fourth Amendment.

b.  Officer Detavis' use of his baton to break the back passenger window of the van did not violate clearly established law.

Officer Detavis again used force when he broke the rear passenger window of Plaintiffs' van with his baton.  By this time, Ms. Farrell had walked to the back of the van to speak with Officer Detavis but had fled back into the van when he tried to handcuff her.  Hezekiah had exited the van, scuffled with Officer Detavis, run back into the van, locked the door, and ignored Officer Detavis' orders (first to get on the ground and later to get out of the van).  Seconds after Hezekiah had refused to comply with his orders to unlock the door, Officer Detavis broke the rear passenger window with his baton.  In his affidavit, he stated that he did so in order to see what was inside the van and to arrest Hezekiah for assaulting him. [Doc. 30] at 6.  In the video,

he can be heard telling Officer Luna that he is trying to get Hezekiah out of the van.  [Doc. 31] at 17:15.  Immediately before he swings the baton for the first time, Officer Luna asks him if Hezekiah has a gun, and he replies, "No."  *Id.*  He then strikes the window four times, sending glass shards flying.  *Id.*  The Court finds that Officer Detavis' action did not violate clearly established law.

Plaintiffs cite two cases in support of their argument that it was clearly established that Officer Detavis violated the Fourth Amendment when he broke the window.  In the first, *Casey*, 509 F.3d at 1285, "a citizen peacefully attempting to return to the courthouse with a file he should not have removed . . . had his shirt torn, and then [was] tackled, Tasered, knocked to the ground by a bevy of police officers, beaten, and Tasered again, all without warning or explanation."  The Tenth Circuit found that the officers involved were not entitled to qualified immunity under those circumstances.

The instant case is readily distinguishable from *Casey*.  By the time Officer Detavis broke the window, Ms. Farrell had already tried to evade him, not once, but twice.  He had not searched the van to see if it contained weapons or other items that might present a risk to himself or the other officers.  Unlike the officers in *Casey*, Officer Detavis was dealing with a situation that had become escalated by virtue of Ms. Farrell and Hezekiah's actions, not by his own doing.  Unlike the plaintiff in *Casey*, Hezekiah had exited the van, ignored Officer Detavis' orders to return to the van, assaulted Officer Detavis, disobeyed his orders to lay on the ground, disobeyed his orders to get out of the van (after he had returned to it), and barricaded himself inside the van so that Officer Detavis could not get to him.  *Casey* could not have placed a reasonable officer on

notice that breaking a window to arrest a suspect for assaulting an officer violated the Constitution.

The second case cited by Plaintiffs in support of their argument that Officer Detavis violated clearly established law is *Christiansen v. City of Tulsa*, 332 F.3d 1270 (10th Cir. 2003). *Christiansen* discussed whether officers violated the Fifth or Fourteenth Amendments when they launched rubber batons into the house of a suicidal man with whom they had been attempting to negotiate. *Id.* at 1278–79. Plaintiffs' reliance on *Christiansen* is entirely misplaced. First, its facts are not comparable to the facts of this case. Second, the analysis in *Christiansen* was not conducted under the Fourth Amendment, which Plaintiffs have urged is the correct standard under which to analyze the officers' use of force in this case. *See* [Doc. 54] at 7–9. Third, the *Christiansen* court ultimately determined that the officers involved were entitled to summary judgment. *Christiansen* provides no support for the notion that the law was clearly established that breaking a window to reach a non-compliant and at least somewhat hostile suspect violates the Fourth Amendment.

At the hearing, Plaintiffs' counsel argued that *Graham* alone should have put Officer Detavis on notice that breaking the window violated the Fourth Amendment. "*Graham* establishes that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest." *Casey*, 509 F.3d at 1285. Preliminarily, Officer Detavis was not dealing with a "non-violent misdemeanant" like the plaintiff in *Graham*, but rather a suspect who had approached and assaulted him, disregarded his orders to lay on the ground, disregarded his orders to get out of the van (once he had returned to it), and then barricaded himself in a vehicle that had not been searched for weapons. Further, "the inquiry into whether a law was clearly

established must be undertaken in the light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201.   The Court is therefore wary of Plaintiffs' suggestion that *Graham* alone gave Officer Detavis fair notice that his conduct violated the Fourth Amendment.

The facts here are closer to *Mecham*, 500 F.3d 1200.   In *Mecham*, the Tenth Circuit granted qualified immunity to an officer who pepper-sprayed the plaintiff in the face after she refused to get out of her car, which was being impounded because she was driving with a suspended license.   The court found that the officer's actions were objectively reasonable under the Fourth Amendment because of the plaintiff's repeated non-compliance with the officer's orders and the danger posed to the officer's position on the narrow shoulder of a busy highway. *Id*. at 1204–06.   In this case, Hezekiah and Ms. Farrell had also refused to comply with Officer Detavis' orders, and Officer Detavis was standing in the road while cars were passing.

None of the cases cited by Plaintiffs directly—or even mostly—squares with the case here. *Mecham* seems to suggest that breaking the window falls into the "hazy border between excessive force and acceptable force." *Saucier*, 503 U.S. at 206.   While his conduct might have been ill-advised considering the presence of children in the van, Officer Detavis did not have fair notice that his conduct violated the Fourth Amendment.   Therefore, the Court concludes that the law was not clearly established.   Officer Detavis is entitled to qualified immunity for breaking the window of the van with his baton.

### b.   Officer Luna

Plaintiffs have not identified any instance of use of force by Officer Luna, and the Court finds none in the record before it.  Therefore, Officer Luna is entitled to qualified immunity on Plaintiffs' claims for excessive force against him.

### c.   Officer Montoya

Officer Montoya used force by firing three shots at Plaintiffs' van as it began to drive away.  Officer Montoya states that he was dispatched to assist with an "uncooperative motorist." When he arrived, he saw Officer Detavis chasing Hezekiah with a weapon but was not sure if it was Taser or a firearm.  He states that he viewed the scene as "clearly threatening and much more escalated than expected."  [Doc. 40-1] at 1.  By the time Officer Montoya got out of his vehicle, Plaintiffs were all back inside the van.  He states that he could not discern the gender or age of the "multiple" people in the van and that he heard the word "gun" and a "banging noise." *Id*. at 2.  A few seconds after Officer Montoya arrived, Officer Detavis began to break the back passenger window.  A few seconds later, the van began to pull away.  In total, only about 15 seconds elapsed between the moment Officer Montoya arrived and the moment he fired the first shot.  [Doc. 31] at 17:05–17:20.  Officer Montoya states that he "had a clear line of fire, with no other traffic in sight."  [Doc. 40-1] at 2.  He alleges that the shots were intended to "immobilize the van" and "prevent any further threat to public safety."  *Id*. at 3.

Clearly established law in the Tenth Circuit prohibits the use of deadly force when an officer does not have "probable cause to believe that there is a serious threat of serious physical harm" to himself or others.  *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1155 (10th Cir. 2010) (citation and quotation marks omitted); *see also Phillips v. James*, 422 F.3d

1075, 1083 (10th Cir. 2005) ("Critical ingredients in the totality of the circumstances' inquiry . . .

include whether the officers were in danger at the precise moment that they used force.")

(citation and quotation marks omitted).

In the context of using deadly force to end a vehicle chase, the Tenth Circuit has stated:

> We do not believe it would be reasonable for an officer to shoot
> any motorist who ran a red light or swerved through lanes, simply
> because reckless driving poses some threat of physical harm to a
> bystander who might be down the road. Car chases inherently risk
> injury to persons who might happen along their course, and if that
> risk alone could justify shooting the suspect, every chase would
> end much more quickly with a swiftly-fired bullet.

*Cordova v. Aragon*, 569 F.3d 1183, 1190 (10th Cir. 2009).

In *Cordova*, an officer shot the driver of a truck who had attempted to ram an officer's

vehicle and then drove down the wrong side of a highway where there were no motorists in the

vicinity. The court noted that some of the officer's shots hit the side of the truck, indicating that

the truck was not "bearing down" on the officer. *Id*. at 1191. It also noted that while the

suspect's driving "did . . . create risks for other motorists who might come along . . . that risk of

future harm was not enough to justify the near certainty of [the suspect's] death." *Id*. at 1190.

The court ultimately found that the officer was entitled to qualified immunity because the law

was not clearly established, *id.* at 1194, noting that "[we] cannot say, however, that the general

risks created by a motorist's fleeing from the police are, without more, enough to justify a

shooting that is nearly certain to cause that suspect's death," *id.* at 1190.

In *Zia Trust Co*., 597 F.3d at 1153, an officer responding to a domestic violence call

ordered the suspect to get out of the van he was driving. When the suspect did not obey and the

van jumped back about a foot toward the officer, the officer shot the suspect in the neck. The

court held that the officer was not entitled to qualified immunity, finding that "[the officer] did not have probable cause to believe that there was a serious threat of serious physical harm to himself or others."  *Id*. at 1155 (citation and quotation marks omitted); *see also Godawa v. Byrd*, 798 F.3d 457, 464 (6th Cir. 2015) ("Where a suspect is attempting to flee in a vehicle, police officers are justified in using deadly force against a driver who objectively appears ready to drive into an officer or bystander with his car.  But, as a general matter, an officer may not use deadly force once the car moves away, leaving the officer and bystanders in a position of safety.") (citation and quotation marks omitted).

The Tenth Circuit has identified four sub-factors courts may consider in evaluating the threat a suspect posed to officer and public safety in the context of the use of deadly force: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect."  *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

Consideration of these factors suggests that the threat to Officer Montoya and others was slight.  The first two factors, which relate to the suspect's use of a weapon, weigh against Officer Montoya, because no weapon was displayed.[10]  As to the third factor (the distance between the officer and suspect), Plaintiffs were inside the van and moving away from the officers, rather than toward them.  As to the fourth factor (the manifest intentions of the suspect), Plaintiffs'

---

[10] Officer Montoya states that he heard the word the word "gun" after he arrived.  [Doc. 40-1] at 2.  He does not say whether he heard Officer Detavis say that there was no gun, nor does he say that hearing the word "gun" actually led him to believe that there was a gun.

obvious intent was to get away, not to harm the officers.  Any danger Plaintiffs posed to the officers dissipated as the van moved farther away from them.  As Officer Montoya noted, there was "no other traffic in sight," [Doc. 40-1] at 2, and thus no risk to any bystanders.  Officer Montoya asserts that "the speeding van posed an actual and imminent threat to the public at large (i.e. any other motorists or pedestrians on Highway 518))."  [Doc. 62] at 10.  This assertion ignores the fact that at the time he fired his weapon, the van had barely begun to move forward. *Cf. Scott*, 550 U.S. at 383–84 (officer entitled to summary judgment on Fourth Amendment claims for ending an ongoing dangerous high-speed chase that posed actual, imminent danger to other drivers, pedestrians, and officers).[11]

Based on the foregoing factors, the Court concludes that a reasonable jury could find that a reasonable officer in Officer Montoya's position would have known that firing three shots towards the van violated the Fourth Amendment.  He is not entitled to qualified immunity on Plaintiffs' claim of excessive force for firing those shots.

### d.  High Speed Chase

Plaintiffs allege that "under *Graham*, Defendants Detavis and Luna's excessive force in pursuing Plaintiffs, creating a high speed chase into the Town of Taos, was unreasonable and violated the Plaintiffs' rights," [Doc. 54] at 17, and that "Defendant Montoya violated Plaintiffs' Fourth Amendment Rights by . . . using deadly force via joining a high-speed chase of Plaintiffs' vehicle," [Doc. 53] at 12.  *Graham*, 490 U.S. 386, analyzes the amount of force that the Fourth Amendment permits an officer to use in effectuating a seizure.  *Id*. at 396.  The Court finds that

---

[11] At the hearing, Officer Montoya's counsel referred to *Mullenix v. Luna*, 136 S. Ct. 305 (2015), in support of his argument that he was entitled to qualified immunity.  Because *Mullenix* was decided over two years after the events in this case, the Court will not consider it in its determination of whether the law was clearly established in 2013.

Plaintiffs have not met their initial burden of establishing that "a reasonable jury could find facts supporting a violation" of the Fourth Amendment with regard to the chase. *Henderson v. Glanz*, 813 F.3d 938, 952 (10th Cir. 2015). That is, Plaintiffs have not identified a use of force by the officers during the chase, much less a use of force that violates the Fourth Amendment. At the hearing, Plaintiffs' counsel argued that the chase itself constituted a use of force, but provided no legal authority for this position. Each of the three officers is entitled to qualified immunity on Plaintiffs' claim of excessive force related to the car chase.

## II.   Failure to Intervene (Count II)

### A.  Standard for Failure to Intervene Claims

A law enforcement officer may be held liable under § 1983 when he fails "to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in [his] presence." *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008) (quoting *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir. 1994). It is clearly established that "an officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . that excessive force is being used." *Hall v. Burke*, 12 F. App'x 856, 861 (10th Cir. 2001) (quoting *Anderson,* 17 F.3d at 557).

Whether an officer "had sufficient time to intercede or was capable of preventing [the violation]" are generally issues of fact for the jury. *Vondrak*, 535 F.3d at 1210. Before the expertise of a jury is required to evaluate the officer's opportunity to intervene, however, he at least must have been present. *Id.*; *Fogarty v. Gallegos*, 523 F.3d 1147, 1163 (10th Cir. 2008) ("Under this circuit's clearly established law, if [the officer] were indeed present at [defendant's] arrest with an opportunity to prevent the excessive use of force, he would have had a duty to

intervene.").   Actual, physical presence, therefore, is a prerequisite to an officer's duty to intervene.  If, however, considering all of the evidence of record, no reasonable jury could find that an officer who *was* present on the scene realistically could have intervened and realistically could have prevented the violation, the issue can be decided on summary judgment.  *Vondrak*, 535 F.3d at 1210.

Plaintiffs allege that each individual Defendant failed to intervene in the other Defendants' uses of force.  [Doc. 1-1] at 9.  The Court will consider these allegations chronologically.  First, Officers Luna and Montoya are entitled to summary judgment on Plaintiffs' claim that they failed to intervene when Officer Detavis was pulling on Ms. Farrell because they were not present when those events occurred.  *See Vondrak*, 535 F.3d at 1210. They are also entitled to summary judgment on Plaintiffs' claim that they failed to intervene when Officer Detavis broke the van's window.  Implicit in the test for failure to intervene is that the officer knows that excessive force is being used.  Because the Court has found that it is not clearly established that Officer Detavis' actions violated the Constitution, neither Officer Luna or Montoya could have "observe[d] or [had] reason to know . . . that excessive force [was] being used." *Hall,* 12 F. App'x at 861.

Finally, as to Officers Detavis and Luna's alleged failure to intervene in Officer Montoya's actions, the Court finds that no reasonable jury could find that they had the time or opportunity to prevent Officer Montoya from firing his weapon.  *See Vondrak*, 535 F.3d at 1210. By the time he fired, Officer Detavis was running back towards his vehicle and was already behind Officer Montoya.  Officer Luna was running towards the van.  [Doc. 31] at 17:20.

Officers Detavis and Luna are entitled to qualified immunity on Plaintiffs' claims for failure to intervene in Officer Montoya's shooting, which took only six seconds.  *Id.* at 17:20–26.

### III.   Failure to Train/Negligent Supervision Claims (Count III)

Defendant NMSPD moves for summary judgment on Plaintiffs' claim that it failed to properly supervise or train Officers Detavis, Luna, and Montoya.  [Doc. 29] at 23–27.  The Court ordered supplemental briefing to determine whether NMSPD was immune from suit.  [Doc. 65].  Under the Eleventh Amendment, an unconsenting State is immune from suit in federal court.  *Cornforth v. Univ. of Okla. Bd. of Regents*, 263 F.3d 1129, 1132 (10th Cir. 2001).  Eleventh Amendment immunity extends to "entities created by state governments which operate as their alter egos or instrumentalities."  *Elam Constr., Inc. v. Reg'l Transp. Dist.*, 129 F.3d 1343, 1345 (10th Cir. 1997) (citations omitted).

Whether an entity is protected by the Eleventh Amendment turns on "'whether the [entity] is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977).

NMSPD urges that it is an arm of the state, while Plaintiffs argue that it is not.[12] *Compare* [Doc. 67] at 1, *with* [Doc. 68] at 3.  Several judges in this district have found that NMSPD is, in fact, an arm of the state.  *See Conner v. Rodriguez*, No. 10-cv-0512 WJ/WDS (D.N.M. Sept. 15, 2010), ECF. No. 20, at *5 ("It is clear to the Court that [the Department of

---

[12] NMSPD is a division of the Department of Public Safety.  *See* NMSA § 1978 § 9-19-4 ("There is created in the executive branch the 'department of public safety.'  The department shall . . . consist of . . . the New Mexico state police division.").

Public Safety ("DPS")] is an 'arm of the state.'"); *Meintzer v. N.M. State Police*, No. 98-cv-133 MV/LFG (D.N.M. June 11, 1998), ECF No. 23, at *4 ("The New Mexico State Police and the Division of Motor Vehicles are not municipalities, but arms of the state."); *Kvech v. State of New Mexico*, No. 12-cv-0267 JB/KBM (D.N.M. May 8, 2012), ECF No. 12, at *1 (granting DPS's unopposed motion to dismiss, in which it argued that it was not an arm of the state.).   In fact, Plaintiffs cited no case, and the Court could find none, where a judge in this district considered the question and determined that NMSPD was not an arm of the state.  The Court therefore finds that NMSPD is an arm of the state.

However, NMSPD asserts, and the Court agrees, that it waived its Eleventh Amendment immunity by removing the case from state court to this Court.   [Doc. 1] Notice of Removal; *see McLaughlin v. Bd. of Tr. of State Colleges of Colo.*, 215 F.3d 1168, 1172 (10th Cir. 2000) (finding that defendant waived its Eleventh Amendment immunity by removing to federal court); *Sutton v. Utah State Sch. for the Deaf and Blind*, 173 F.3d 1226, 1233 (10th Cir. 1999) (An arm of the state may "assert the Eleventh Amendment as a defense in federal court unless it has waived the defense and consented to suit in federal court.").

But that does not mean that Plaintiffs' § 1983 claim against NMSPD may proceed.  A cause of action under § 1983 requires the deprivation of a civil right by a "person" acting under color of state law.  42 U.S.C. § 1983; *Sutton*, 173 F.3d at 1237.  The Supreme Court held in *Will v. Mich. Dep't of State Police* that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983."  491 U.S. 58, 71 (1989).  "A governmental entity that is an arm of the state for Eleventh Amendment purposes is not a 'person' for § 1983 purposes." *McLaughlin*, 215 F.3d at 1172  (citations and quotation marks omitted) (finding that although

31

state entity waived its Eleventh Amendment immunity by removing case to federal court, plaintiff had failed to state a claim against it because state entity was not a "person" under § 1983). The Honorable James O. Browning, United States District Judge, explained it this way:

> At first glance, it might seem odd to find that the [state entity] waived its Eleventh Amendment immunity by removing the case to federal court and then finding that [plaintiff] cannot sue the [state entity] because it is not a person under § 1983. Those are, however, separate issues. The Court does not lack subject-matter jurisdiction, but instead has the power to decide that the state entity is not a person under § 1983. While the Court agrees that the [state entity] is not a person amenable to a claim under § 1983, dismissal for such a defect is for failure to state a claim under rule 12(b)(6) and not for lack of subject-matter jurisdiction.

*Armijo v. New Mexico*, 2009 WL 3672828, at *3 (D.N.M. Sept. 30, 2009) (unpublished). Thus, the Court will dismiss Plaintiffs' claims under § 1983 against NMSPD because it is not a proper defendant.

## IV.   State Claims (Count IV)

Defendants Officer Detavis and Officer Luna did not move for judgment on the state law claims against them. *See* [Doc. 29]. However, Officer Montoya moved for judgment on the pleadings on all three state law claims—assault, battery, and malicious abuse of process. *See* [Doc. 40] at 22–24. A motion for judgment on the pleadings is reviewed under the same standard as a motion to dismiss for failure to state a claim. *See Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003). Rule 12(b)(6) authorizes a court to dismiss a complaint in whole or in part for failing to state a claim upon which relief is available. In considering motions for failure to state a claim, courts must accept all well-pleaded factual allegations as true, and determine if the plaintiff is plausibly entitled to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 6778 (2009). The

court must make all reasonable inferences from the pleadings in favor of the non-moving party.

*Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012).

### A.  Immunity

The New Mexico Tort Claims Act ("NMTCA") states that a "governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived" by state statute.  NMSA 1978 § 41–4–4(A).  Section 41–4–12[13] provides a list of torts for which law enforcement officers' immunity is waived, which includes the state-law causes of action asserted by Plaintiffs:

> The immunity granted pursuant to Subsection A of Section 41–4–4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

Thus, the New Mexico Legislature has waived Officer Montoya's immunity under the NMTCA for the Plaintiffs' state-law claims—assault, battery, malicious abuse of process, and violation of the New Mexico Constitution.

### B.  Assault and Battery

Under New Mexico law, "[b]attery occurs when 'an individual acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and . . . an offensive contact with the person of the other directly

---

[13] Included in Count IV of Plaintiffs' Complaint is a heading entitled "ALL INTENTIONAL TORTS."  [Doc. 1-1] at 13–14.  As best as the Court can discern, this section is not intended to assert a separate cause of action, but rather to state Plaintiffs' belief that Defendants' immunity for these three torts is waived under NMSA 1978 § 41–4–12.

or indirectly results.'" *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1208–09 (10th Cir. 2006) (citing *State v. Ortega*, 1992-NMCA-003, 113 N.M. 437). For an assault to occur, there must have been an "act, threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery." *Id*. at 1208 (citing NMSA 1978 § 30–3–1(B)).

Plaintiffs' claims of assault and battery arise from the same facts as their excessive force claims. Plaintiffs' state tort claims, similar to the excessive force claims, involve determinations about the reasonableness of Officer Montoya's actions. *See Mead v. O'Connor*, 1959-NMSC-077, ¶ 4, 66 N.M. 170, 172–73 (in deciding whether a state police officer was liable for assault, the fact finder was required to determine if the officer used "such force that was reasonably necessary under all of the circumstances"); *St. John v. McColley*, 653 F. Supp. 2d 1155, 1165 (D.N.M. 2009) (concluding that a jury must determine whether defendant law enforcement officials acted reasonably and in good faith in relation to battery claims).

With respect to the Plaintiffs' battery and assault claims, the Court has already concluded that a reasonable jury could conclude that Officer Montoya was not justified in using deadly force. *See supra* Analysis Section I. There is a genuine issue of material fact as to whether Officer Montoya used excessive force, and, as such, there is also a genuine issue of material fact as to whether he committed assault and battery. *See Peña v. Greffet,* 922 F. Supp. 2d 1187, 1229 (D.N.M. 2013) ("An officer can be held liable for assault and battery if he uses excessive force.") (citations and quotation marks omitted). A reasonable jury could conclude that Officer Montoya's actions were not lawful. The Court will deny Officer Montoya's motion for judgment on the pleadings on Plaintiffs' assault and battery claims without prejudice.

### C.  Malicious Abuse of Process

Under New Mexico law, the elements of a malicious-abuse-of-process action are: "(1) the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge; (2) a primary motive in the use of process to accomplish an illegitimate end; and (3) damages."  *Durham v. Guest*, 2009-NMSC-007, ¶ 29, 145 N.M. 694, 701.  An improper use of process may occur in two ways: "(1) filing a complaint without probable cause; or (2) an irregularity or impropriety suggesting extortion, delay or harassment, or other conduct formerly actionable under the tort of abuse of process."  *Id.*  (quotation marks omitted).  As discussed above, NMSA 1978 § 41–4–12 waives law enforcement officers' immunity for malicious abuse of process.

Officer Montoya moves for judgment on the pleadings because, he argues, Plaintiffs cannot show that he "filed a criminal case against them without probable cause or show a procedural impropriety."  [Doc. 40] at 24.  The remainder of his argument is based on his assertion that Ms. Farrell and Hezekiah's arrests were supported by probable cause.

However, as noted above, lack of probable cause is not the only way to establish malicious abuse of process; a plaintiff can also show malicious abuse of process by pointing to "some irregularity or impropriety suggesting extortion, delay or harassment."  *DeVaney v. Thriftway Mktg. Corp.*, 1998-NMSC-001, ¶ 28, 124 N.M. 512, 522 (*overruled on other grounds by Durham,* 2009-NMSC-007). One example of malicious abuse of process recognized by the New Mexico Supreme Court is oppressive conduct in connection with an arrest.  *DeVaney*, 1998-NMSC-001, ¶ 28.

35

The Court is not convinced that the conduct alleged—firing shots at the van or failing to call off the chase after Plaintiffs fled—constitutes "oppressive conduct in connection with an arrest" under New Mexico law.  However, Officer Montoya's current motion does not meet his burden as the movant to show that Plaintiffs cannot prove their claim, i.e., to show that he is entitled to judgment on the pleadings.[14]  Specifically, he has simply not addressed whether his conduct could constitute "oppressive conduct in connection with an arrest."  Therefore, the Court will deny Officer Montoya's motion for judgment on the pleadings as to the charge of malicious abuse of process without prejudice.

## V.    "State Tort Claims for Damages Proximately Caused by the Violation of Federal and State Constitutional Rights" (Count V)

Officer Montoya also moves for judgment on the pleadings as to Count V.  [Doc. 40] at 25.  Count V is entitled "State Tort Claims for Damages Proximately Caused by the Violation of Federal and State Constitutional Rights." [Doc. 1-1] at 14.  The confusing title notwithstanding, it appears that Plaintiffs intended to assert that Officer Montoya's conduct violated Article II, Section 10, of the New Mexico Constitution, the state's version of the Fourth Amendment. Section 10 provides that:

> The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures, and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the persons or things to be

---

[14]In his Reply, Officer Montoya argues that Plaintiffs cannot meet the elements of malicious abuse of process because the criminal charges filed against Ms. Farrell did not terminate in her favor.  [Doc. 62] at 18.  In support of his argument, Officer Montoya cites cases from a variety of federal courts.  However, New Mexico law does not require that the underlying criminal prosecution terminate in the plaintiff's favor in order to have a claim for malicious prosecution.  *McDow v. Gonzales,* No. CIV 07-1266 JB/WPL, 2008 WL 5979833, at *44 n.5 (D.N.M. Sept. 30, 2008) ("In New Mexico, a state-law claim for malicious abuse of process does not require a favorable termination before a plaintiff brings the claim."); *see also Durham*, 2009-NMSC-007 ¶ 29, (listing elements of malicious abuse of process in New Mexico, which do not include termination in plaintiff's favor).

seized, nor without a written showing of probable cause, supported
by oath or affirmation.

Officer Montoya argues that because "the New Mexico state courts generally apply the
*Graham v. Connor* objective reasonableness standard . . . [P]laintiffs' claims under Article II,
Section 10 of the state constitution are barred as well." [Doc. 40] at 25.   In other words, his
argument is that because Plaintiffs' claim of excessive force fails under the Fourth Amendment,
it must fail under the state constitution as well.   However, the Court has denied Officer
Montoya's motion for qualified immunity on the Fourth Amendment claim.   Thus, he has failed
to show that he is entitled to judgment on the pleadings on Plaintiffs' state constitutional claims
and the Court will deny his motion without prejudice.

## CONCLUSION

**IT IS THEREFORE ORDERED THAT:**

   i.   Defendants Detavis, Luna, and NMSPD's Motion for Summary Judgment
[Doc. 29] is **GRANTED**, and the § 1983 claims against them are **DISMISSED
with prejudice**;

   ii.   Defendant Montoya's Motion for Summary Judgment [Doc. 40] is **GRANTED in
part and DENIED in part**. He is entitled to qualified immunity for failing to
intervene (Count II).  He is also entitled to qualified immunity on Plaintiffs' claim
of excessive force related to the high-speed chase (Count I).  Those claims are
**DISMISSED with prejudice**.  However, Defendant Montoya is not entitled to
qualified immunity for firing three shots at the van (Count I);

   iii.   Defendant Montoya's Motion for Judgment on the Pleadings on Plaintiffs' state
tort and state constitutional claims (Counts IV and V) is **DENIED**;

iv.    The state tort and state constitutional claims against Officers Detavis, Luna, Montoya and NMSPD (Counts IV and V) remain;

v.     All claims against the three John Doe Defendants remain.

**IT IS SO ORDERED.**

_____
**STEPHAN M. VIDMAR**
**United States Magistrate Judge**
**Presiding by Consent**